NEW YORK TRUST CO. et al. v. FARMERS' IRR. DIST. ·

FARMERS' IRR. DIST. v. NEW YORK TRUST CO. et al.

(Circuit Court of Appeals, Eighth Circuit. April 14, 1922.)

Nos. 5915, 5916.

1. Waters and water courses ⬅➡228½, New, vol. 10A Key-No. Series—Irrigation district bondholders cannot complain of terms of surrender made by their appointees, unless they defeat consideration for bondholders' agreement.

Where the bondholders of an irrigation district proposed to surrender a part of the bonds and to accept payment of the balance in smaller installments at lower interest, if the United States would take over the district, and provided that the details of the taking over should be worked out by a board composed of the persons named in the proposal, the bondholders cannot object to the details as worked out by the board so appointed by them, unless they invalidated the contract with the United States, so as to defeat the consideration for the bondholders' agreement.

2. Statutes ⬅➡141 (2)—Nebraska statute conferring additional power on irrigation districts held not an amending act subject to requirement as to inclusion of section or sections amended.

Laws Neb. 1917, c. 191, passed to enable irrigation districts organized under the laws of Nebraska to co-operate with the United States in the matter of irrigation projects, as contemplated by Act Feb. 21, 1911 (Comp. St. §§ 4738–4740), was an independent act complete in itself, and not affected by Const. Neb. art. 3, § 11, providing that no law shall be amended, unless the new act contains the section or sections so amended.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
280 F.—50

3. **Waters and water courses ☞228½, New, vol. 10A Key-No. Series—Nebraska irrigation district has authority to contract for operation by United States.**

Under Rev. St. Neb. 1913, § 3467, as amended by Laws 1917, c. 83, and under Laws Neb. 1917, c. 191, an irrigation district of Nebraska was given authority to make a contract for the operation of its project by the United States.

4. **Waters and water courses ☞231—Operation of irrigation system does not give United States right to determine amount of taxes to be levied.**

A contract by a Nebraska irrigation district giving the United States authority to operate the district's system and obliging the district to collect taxes sufficient to meet the expenses of operation, and to exercise the control of the service given by Rev. St. Neb. 1913, § 3465, as amended by Laws Neb. 1917, c. 82, for the purpose of enforcing irrigation taxes, did not deprive the district of its power to determine the amount of taxes to be levied, and did not invade the sovereign powers of the state.

5. **Waters and water courses ☞217—Operation of irrigation system for landowners is not exercise of state sovereignty.**

The management and operation of an irrigation system for the benefit of the landowners is not an exercise of any of the powers of state sovereignty, so that a contract giving such management to the United States was not a grant of state sovereignty.

6. **Waters and water courses ☞222—Interest of United States in irrigation district held to authorize contract by it.**

Where a state irrigation district had purchased from the United States Reclamation Service a water right which was not yet paid for, and had contracted to carry through its canals water for the reclamation project, and there was grave danger the irrigation district would be unable to operate its system, the Reclamation Service had such an interest in the district that it might contract for the operation of the district under Act Feb. 21, 1911, § 2 (Comp. St. § 4739), authorizing the Secretary of the Interior to co-operate with irrigation districts for the construction or use of reservoirs, canals, or ditches.

7. **Waters and water courses ☞222—Reclamation Service may operate irrigation system without acquiring title.**

The Reclamation Service has authority to take over the operation of a state irrigation district system for the purpose of protecting its claims against the district without acquiring absolute title to the project.

8. **Contracts ☞300(3)—Party causing delay cannot object contract was not completed in time.**

A party to a contract cannot object that the terms of the contract were not settled within the time specified in his proposal, where the delay was caused by him.

9. **Waters and water courses ☞228½, New, vol. 10A Key-No. Series—Contract that Reclamation Service should "take over" irrigation system does not require transfer of title.**

In a proposal by the bondholders of an irrigation district, agreeing to reduce the principal and interest of their bonds if the United States should take over the district, the words "take over" must be given their primary meaning, to assume control or management of, and do not require the transfer of absolute title to the United States, especially where the other provisions of the proposal were not consistent with an outright sale of the property to the United States, but were consistent with the assumption of management and control by the United States.

10. **Waters and water courses ☞228½, New, vol. 10A Key-No. Series—Contract between irrigation district and Reclamation Service held not burdensome to bondholders.**

A contract between the bondholders of an irrigation district, which was unable to continue the operation of its system, the failure of which would have resulted in loss to the bondholders, whereby the bondholders

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

agreed to surrender less than 10 per cent. of their bonds and to give additional time at lower rate of interest for payment of the remaining bonds, in consideration of the taking over and operation of the district by the United States, was not burdensome.

11. **Waters and water courses ⟨⟩228½, New, vol. 10A Key-No. Series—District held liable for interest on bonds to be canceled during delay in procuring acceptance by Reclamation Service.**

Where the bondholders of an irrigation district agreed to release a portion of the bonds and to accept a lower rate of interest on the last of the bonds, on condition that the United States should take over the operation of the system and should procure from the Secretary of the Interior the approval of the United States for the terms of payments of the remaining bonds of the district, the district was properly charged with interest on all its bonds prior to the time it procured the approval of the Secretary of the Interior, though before that date it had performed the condition of securing a contract for the operation and maintenance of its system by the United States.

Appeal from the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Action begun at law by the New York Trust Company and another against the Farmers' Irrigation District, which was transferred to the equity docket on the filing of an equitable answer by defendant. From a decree awarding plaintiffs the money relief sought, but sustaining the validity of the contract attacked, both parties appeal. Affirmed.

See, also, 280 Fed. 797.

Some years prior to June 22, 1915, there existed a corporation organized and existing under the laws of the state of New Jersey, known as the Tri-State Land Company. This corporation had been engaged in the construction and completion of an irrigation project in the counties of Morrill and Scotts Bluff, Neb., which was to be supplied with water taken from the North Platte river through a gravity canal, the headgate of which was about one-half mile east of the Nebraska-Wyoming state boundary line on the north side of the North Platte river and of a total length of approximately 86 miles. Upon completion of the canal the operation thereof was placed in charge of the Farmers' Mutual Canal Company, a subsidiary corporation of the Tri-State Land Company. On or about January 23, 1913, said irrigation canal and its headgate, and all of the irrigation works and the appurtenances thereunto belonging, were transferred and conveyed by the Tri-State Land Company and the Farmers' Mutual Canal Company to the Farmers' Irrigation District, a Nebraska corporation, in consideration of bonds of said district of the aggregate par value of $2,703,000, bearing interest at 6 per centum per annum, payable semiannually, no part of the principal of which was to be paid during the first 10 years. Said bonds were deposited by the Tri-State Land Company with and turned over to the New York Trust Company as collateral security to secure the payment of certain bonds theretofore issued by said Tri-State Land Company in the principal sum of $1,691,000, of which bonds the said New York Trust Company was trustee.

For a long time prior to June, 1915, the Farmers' Irrigation District and the Tri-State Land Company had been insolvent and without pecuniary resources to meet their obligations, and the irrigation project, which had been constructed as heretofore stated and transferred to the Farmers' Irrigation District, was in danger of becoming an absolute failure, with the consequent loss of all money that had been invested therein. A bondholders' committee, the Tri-State Land Company, and the Farmers' Irrigation District had been engaged continuously in trying to solve the problem of how to continue the operation of the irrigation system and the distribution of water for the benefit of the agricultural lands lying within the boundaries of the district. There

had been efforts made and negotiations had with the reclamation officers of the United States, in charge of what is known as the North Platte irrigation project, which obtains its water for irrigation purposes from the Pathfinder reservoir, located on the North Platte river in the state of Wyoming. The Tri-State Land Company had entered into a contract with the United States by which the Land Company had obligated itself to pay $500,000 for the right to take water from the Pathfinder reservoir, there was a balance of $475,000 due on the contract, and the failure to make the stipulated payment had caused the United States to threaten a forfeiture of the right. The United States was desirous of having the Farmers' Irrigation District assume this' contract and of acquiring the permanent carriage right of 250 second feet of water through the main canal of the Farmers' Irrigation District from the North Platte river to Red Willow creek for the irrigation of an additional unit to be included in the North Platte project of the United States. In this condition of affairs, the Tri-State Land Company bondholders' committee, by C. N. Wright, agent, and W. N. Ferguson, bondholder, made the following proposal to the Farmers' Irrigation District:

"To the Farmers' Irrigation District:

"Whereas, there is a prospect of the United States taking over and operating the Farmers' Irrigation District canal; and

"Whereas, there has been discussion between representatives of said district and the bondholders' committee of the Tri-State Land Company and W. N. Ferguson, who holds practically all of said bonds, as to the terms on which said bondholders and said W. H. Ferguson would be willing to modify the terms and conditions of payment of said bonds in the event of the United States taking over said district canal:

"Now, in order that the purpose and intention of said bondholders may be definitely understood, said bondholders' committee and W. H. Ferguson propose:

"First. To turn over to said district for cancellation $203,000 of said district bonds.

"Second. To reduce the interest rate on the remainder of said bonds from 6 per cent. semiannual to four per cent. per annum; and

"Third. To adopt the government plan of payment on the balance of said bonds, to wit, 2 per cent. of interest and principal of said bonds shall be paid for each of the first 4 years, 4 per cent. of said interest and principal shall be paid for the fifth and sixth years, and 6 per cent. of said interest and principal shall be paid each the next 14 years.

"This proposition is made upon the consideration and with the understanding that it is to further and facilitate the negotiations with the United States respecting latter taking over said district irrigation works, which negotiations are to be brought to a conclusion within 2½ years from date of this instrument; it being understood that the other details, terms, and conditions for the taking over of said district irrigation works by the United States shall be worked out by a board consisting of Andrew Weiss, as advisory member, and S. K. Warrick and C. N. Wright, of Scotts Bluff, Neb., representing the bondholders, and John Mueller, of Bayard, Neb., and L. L. Raymond, of Scotts Bluff, Neb., representing the district. The vote of three of the four active members of said board shall be binding. If said board shall fail in its negotiations with the United States, it shall then formulate a revised schedule of time of payments of bond principal and interest, which revised schedule shall be placed in force and effect by the bondholders.

"It is also understood that the proposition herein contained is not a part consideration for the passage by the district of contract now pending between the Tri-State Land Company, Farmers' Irrigation District, and the United States, but is an entirely separate, distinct, and independent proposition.

"In the event that above board finds its duties and plans interfered with by lack of legal authority, then said board shall join in securing the requisite authority; it being understood, however, that lack of authority ·for district action shall not preclude the board from endeavoring to carry out its plans through individual contractual relations between the landowners and the bondholders; it being understood that there shall be no action of this board

that will invalidate the existing lawful obligation of the district in the instance of the bonds remaining after the cancellation of the $203,000 as hereinabove provided.

"Dated this 22d day of June, 1915.

"Tri-State Land Company Bondholders' Committee,
"By O. N. Wright, Agent.
"W. N. Ferguson, Bondholder."

In consideration of said proposal, the electors of the Farmers' Irrigation District, at an election duly held, voted in favor of the adoption and ratification of the carriage contract heretofore mentioned and the assumption by the Farmers' Irrigation District of the obligation of said $475,000 owing to the United States by the Tri-States Land Company. The committee appointed in the proposal met from time to time for the purpose of framing and perfecting a course of procedure by which the United States could enter into a contract to take over and operate the works and system of the Farmers' Irrigation District during the period in which said bonds were being paid and satisfied. These negotiations were carried on for a period of more than two years, and required repeated visits to Washington, D. C., for the purpose of making a complete presentation of the entire scheme to the Department of the Interior and the United States Reclamation Service. As a result of these negotiations the following contract was executed by and between the United States and the Farmers' Irrigation District:

"This agreement, made December 12, 1917, between the United States of America, acting in this behalf by the Secretary of the Interior, Reclamation Service, pursuant to the Act of June 17, 1902 (32 Stat. 388), and acts amendatory thereof and supplementary thereto, and the Farmers' Irrigation District, a corporation organized and existing under the laws of the state of Nebraska, hereinafter styled the District, its successors and assigns, witnesseth:

"Whereas, by contract dated August 10, 1915, with the United States, the District purchased the right to the delivery of water stored in Pathfinder reservoir of the North Platte project, agreeing to pay therefor the sum of $475,000 in annual installments as therein specified; and

"Whereas, by the terms of the aforesaid contract the United States acquired the permanent carriage right of 250 second feet of water through the District's main canal from North Platte river to Red Willow creek for the irrigation of an additional unit proposed to be included in the North Platte project of the United States; and

"Whereas, the United States in its necessary drainage of its North Platte project lands must carry the drainage through the District's lands, and can consequently effect a considerable saving and derive much benefit from the acquisition of the right for co-operative use of the District's drainage works, heretofore or hereafter constructed; and

"Whereas, it is necessary for the District to secure some readjustment of the annual payments to the bondholders, including a lower schedule of payment in the beginning years in order (1) that any possible default upon said bonded indebtedness may be obviated; (2) that prompt payment may be made to the United States of the sums due annually for storage water contract; (3) that the District may at all times maintain its irrigation works in such condition of repair and efficiency as to insure proper carriage and delivery of water to the United States, as provided in said contract of August 10, 1915; (4) that a proper drainage system may be constructed within said District and so designed as to permit joint use by the United States for drainage of the North Platte project lands; and

"Whereas, in connection with said readjustment, it is necessary that the United States should have such control and supervision over the irrigation works and system of the district, and their operation and maintenance, as will fully and completely protect the interests of the United States in said agreement of August 10, 1915, for storage water for the District and carriage rights for the United States, as well as conserve the water supply and aid the United States in the drainage of its North Platte project lands:

"Now, therefore, in consideration of the bondholders and the District making a satisfactory arrangement as between themselves, that is acceptable to

the Secretary of the Interior, and properly providing among other things for—

"(a) Cancellation of the bondholders of $203,000 of the $2,203,000 of bonds outstanding.

"(b) Four per cent. interest per annum payable annually, instead of the present six per cent. per annum payable semiannually.

"(c) Adoption of the United States' 20-year plan of payment; and

"In further consideration of the mutual covenants herein contained, and the mutual advantages to be derived, it is agreed:

"The District shall convey to the United States in trust, as provided by the laws of the state of Nebraska, the irrigation works and systems of the district, which shall be operated and maintained by the United States until full payment has been made to the United States for the purchase of stored water and full payment shall have been made on the bonds herein referred to. The trust conferred upon the United States shall terminate upon full payment of all amounts due the United States and of all obligations on account of the bonds herein referred to, unless said trust is continued by mutual agreement of the parties hereto, but shall in any event terminate 30 years from the date of conveyance by the District to the United States.

"2. All expenditures made by the United States for the District shall be paid by the District as part of the operation and maintenance of the irrigation works and system, and shall become due on March 1, in advance or under such other plan as may be required by the Secretary of the Interior. Any amount not paid when due shall bear interest from such date until the date of payment at the rate of 10 per cent. per annum, and the United States shall be authorized to avail itself of any remedies which may be necessary in order to procure payment from the District. The District shall annually levy and collect taxes sufficient in amount for the general fund to meet the necessary expenses of operation and maintenance of the irrigation works and system and the annual payments to the United States for storage water, and for the bond fund to meet the payments due the bondholders.

"3. The District shall exercise its authority under the law to shut off the water supply from any land for which the District taxes have not been paid in full within two years from the date when due, and the United States, through its representative operating and maintaining the works of the District, may exercise said authority to shut off water. The District will cooperate with the United States by the exercise of all its powers in securing all practicable economy in the use of water.

"4. The District shall at its own expense perform all drainage work necessary to care for the seepage on its lands, otherwise irrigable, and will permit the United States to use such portions of the District's drainage works as may be necessary for the drainage of the lands in the North Platte project under such conditions and arrangements as may be agreed upon. The District shall take all necessary action to provide for the reclamation by drainage of as large an area each year as may be practicable, and shall, so far as practicable, reclaim all the water-logged area in the District within 4 years from the date of this contract.

"5. That all expenses in the readjustment or payment of said bonds shall be provided for in the contract between the District and the bondholders, and the United States shall in no way be liable for any portion of such expense, for the payment of said bonds, or the interest thereon.

"6. This contract shall become binding on the parties hereto and effective only when there has been submitted to the Secretary of the Interior satisfactory evidence that $203,000 of the $2,203,000 bonds of the District outstanding have been canceled, and that there have been deposited with him certified copies of the agreement entered into between the bondholders and the District and declared by him in writing as satisfactory, which papers shall provide, among other things:

"(a) That the bondholders of the District shall accept 4 per cent. interest per annum payable annually on the $2,000,000 of bonds left outstanding, in lieu of the 6 per cent. semiannually provided for in said bonds; and

"(b) That the payment of said $2,000,000 of bonds outstanding, together with the interest thereon, shall be in the percentage provided for payment of

construction charges on reclamation projects in accordance with section 2 of the Reclamation Extension Act of August 13, 1914 [Comp. St. § 4713b].

"7. No member of or delegate to Congress, or resident commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, shall be admitted to any share or part of this contract or agreement, or to any benefit to arise thereupon. Nothing, however, herein contained, shall be construed to extend to any incorporated company, where such contract or agreement is made for the general benefit of such incorporation or company, as provided in section 116 of the Act of Congress approved March 4, 1909 (35 Stat. 1109 [Comp. St. § 10286]).

"This agreement is executed in pursuance of a resolution of the board of directors of the District, of which a certified copy is hereto attached.

"In witness whereof this contract has been executed on behalf of the parties and the seal of the District has been attached.

<blockquote>
"The United States of America,<br>
"By Franklin K. Lane, Secretary of the Interior.<br>
"Farmers' Irrigation District,<br>
"By F. H. Riege, President,<br>
"B. J. Seger, Secretary."
</blockquote>

This contract was duly executed on behalf of the United States by its Secretary of the Interior, Franklin K. Lane, and on behalf of the irrigation district by its president and secretary. On December 17, 1917, notice was given by resolution of the acceptance of the proposal by defendant. It is conceded that the proposal of June 22, 1915, was executed as stated, and that the signers of the same obligated their principals. It is conceded that the contract between the United States of America and the Farmers' Irrigation District was properly executed, except it is denied that the District or the United States had the power to agree to do the things which they agreed to do. A formal deed of conveyance was made and delivered to the United States by the Farmers' Irrigation District, the granting clause of which is as follows:

"Now, therefore, in consideration of the premises and of the benefits and advantages to accrue to said Farmers' Irrigation District under said contract and the deed executed in pursuance of its terms, the said Farmers' Irrigation District, a corporation duly organized under and pursuant to the laws of the state of Nebraska, does hereby sell and convey unto the United States of America, in trust, the irrigation works and system of the Farmers' Irrigation District, a corporation, for the uses and purposes specifically set forth and stated in the said contract approved by the Secretary of the Interior July 17, 1917, and executed by and between the District and the United States, acting through the Reclamation Commission on September 10, 1917, which contract and all its terms and provisions are hereby referred to and made a part of this conveyance, and it is hereby declared that this conveyance shall be interpreted and construed as between the parties hereto under and according to all of the terms, provisions, conditions, and limitations of said contract.

"To have and to hold the property above conveyed unto the United States of America, in trust, for the uses and purposes set forth in the contract herein referred to."

On November 14, 1918, the New York Trust Company et al., hereafter called plaintiffs, commenced an action at law against the Farmers' Irrigation District, hereafter called defendant, for the purpose of recovering the sum of $15,000 claimed to be due upon 1,000 interest coupons attached to the bonds of the defendant issued as hereinbefore stated, which coupons had matured July 1, 1918. The defendant by answer admitted the issuance and delivery of the bonds and coupons as claimed by the plaintiffs, but pleaded as an equitable defense the contract claimed to have been made by the plaintiffs by the proposal of June 22, 1915, and the acceptance thereof and compliance with its terms by the defendant. The action was transferred to the equity docket. The cause came on for trial, and the court rendered judgment in favor of plaintiffs for the sum of $15,000, with interest thereon from July 1, 1918. The court also found that the proposal of June 22, 1915, and the performance by the defendant of the stipulated requirements upon which the proposal was

based, constituted a valid contract between the plaintiffs and the defendant, and should be enforced according to its terms.

It had developed, however, during the trial, that, of the total number of bonds issued by the defendant, $97,300 of the same were not controlled by the plaintiff bondholders' committee, and six months was given defendant in which the holders of such bonds might comply with the requirements of the Secretary of the Interior, and that the defendant should also have the same time to submit satisfactory proof that the readjustment of the bonded debt and rate of interest provided for in the contract executed by plaintiffs and defendant, as enforced by the decree of the court, had been declared by the Secretary of the Interior in writing as satisfactory to him, within the purview of paragraph 6 of the contract executed by the Secretary of the Interior. The relief therefore granted to the defendant was made interlocutory, for the purpose of arranging the matters above specified. The defendant appealed from that part of the decree in favor of the plaintiff, and such appeal is known in this court as No. 5768. On April 14, 1921, the cause again came on for hearing upon the petition of the defendant to have the interlocutory decree entered September 18, 1920, made final and absolute. At the request of the plaintiffs the case was reopened and some additional testimony taken. The defendant produced the bonds that were not subject to the control of the bondholders' committee, and it was conceded by the plaintiffs that the bonds were produced by the defendant with past-due coupons attached. The defendant also produced the following certificate by the Secretary of the Interior:

"The Secretary of the Interior.

"Washington, February 14, 1921.

"I, John Barton Payne, Secretary of the Interior, do hereby certify that the readjustment of the bonded debt of the Farmers' Irrigation District, the rate of interest thereon, and terms of payment thereof, as decreed and provided for in the interlocutory decree of the United States District Court for the District of Nebraska, entered on September 8, 1920 (case of New York Trust Company et al. v. Farmers' Irrigation District), is satisfactory and acceptable to me, within the purview of paragraph 6 of the contract between the United States and said Farmers' Irrigation District, signed by the Secretary of the Interior on December 12, 1917, conditioned, however, upon the production and delivery to the clerk of said court, for the purpose of being subjected to the modifications prescribed in said decree, of all of the $97,300 of the bonds of said district mentioned therein which are not held by the Tri-State Land Company bondholders' committee, in excess of the principal sum of $50,000, the cancellation of $203,000 of said bonds in the control of said bondholders' committee as provided in said decree prescribed of all of the residue of said bonds, excepting the said $50,000 of those not in said committee's control, this being accepted by me as a substantial compliance in that behalf with the said contract of December 12, 1917.

"John Barton Payne, Secretary."

The trial court, after again considering the case and the evidence, entered a final decree enforcing the contract between plaintiffs and defendant according to its terms, and also providing for the adjustment of the bonded debt of the defendant according to the terms of the contract. From this decree the plaintiffs appealed, and the appeal is known in this court as No. 5915. The defendant also appealed, and that appeal is known as No. 5916. We believe that enough has been stated to present the several contentions of the parties. Additional facts may be stated, however, if it becomes necessary in considering any particular contention.

Jessee L. Root and Fred A. Wright, both of Omaha, Neb. (John J. Sullivan and Byron Clark, both of Omaha, Neb., on the brief), for New York Trust Co. and others.

Halleck F. Rose, of Omaha, Neb. (L. L. Raymond, of Scotts Bluff, Neb., Charles P. Craft, of Aurora, Neb., and John F. Stout, Arthur R. Wells, and Paul L. Martin, all of Omaha, Neb., on the brief), for Farmers' Irr. Dist.

Before CARLAND and STONE, Circuit Judges, and TRIEBER, District Judge.

CARLAND, Circuit Judge (after stating the facts as above). [1] The consideration on the part of plaintiffs for the proposal of June 22, 1915. was the taking over of defendant's irrigation works by the United States, the negotiations to accomplish which they desired to further and facilitate. The details, terms, and conditions of such taking over, other than those specified in the proposal, were to be worked out by a board composed of the persons named therein. The plaintiffs are not parties to the contract of December 12, 1917. The parties to that contract find no fault with it, and so far as the record shows are willing to perform it. As the details, terms, and conditions thereof, other than those specified in the proposal, were left to a board appointed by the plaintiffs themselves, they cannot complain of such details, terms, and conditions, unless it can be said that they necessarily render the contract void; in other words, the plaintiffs, to show a failure of consideration for the proposal, must show that the contract of December 12, 1917, and the deed executed by defendant in pursuance thereof, do not for some reason constitute a taking over by the United States of defendant's irrigation works, within the meaning of those words as used in the proposal, or that the contract is so repugnant to the specified terms of the proposal as to render it void.

Taking up the objections made by counsel for plaintiffs to the validity of the contract of December 12, 1917, we proceed to consider the contention that the defendant had no authority under the laws of Nebraska to make it, and that, if said laws confer such authority, such laws and the acts of defendant thereunder are void, as attempts to surrender and grant to the United States the inalienable sovereign powers of the state of Nebraska, known as the police power and powers of taxation and eminent domain. By the last clause of the proposal of June 22, 1915, it is made apparent that the bondholders anticipated that there might be a want of legal authority on the part of defendant to enter into an agreement whereby the United States could take over and operate the defendant's irrigation canal. Therefore the board appointed by the proposal was authorized to join with the defendant in securing the requisite authority.

[2] The defendant is a public corporation of Nebraska. Section 3465, Rev. Stats. Neb. 1913, prescribes the powers and duties of the board of directors of such corporation. Section 3467 of the same statutes provides how the title to property of such corporations shall be held. Undoubtedly for the purpose of enabling irrigation districts organized under the laws of Nebraska to co-operate with the United States in the matter of irrigation projects, as contemplated by the Act of February 21, 1911, 36 Stat. 925, 926 (Comp. St. §§ 4738–4740), the Legislature of Nebraska on March 28, 1917, passed chapter 191, Laws of Nebraska 1917, p. 464. Under the decisions of the Supreme Court of Nebraska, this law would not be affected by section 11 of article 3 of the state Constitution, which provides in substance that no law shall be amended unless the new act contains the section or sections so

amended. Chapter 191 above referred to is an independent act, complete in itself. State v. Cornell, 50 Neb. 529, 70 N. W. 56; Zimmerman v. Trude, 80 Neb. 503, 114 N. W. 641; State v. Ure, 91 Neb. 31, 135 N. W. 224; Stewart v. Barton, 91 Neb. 96, 135 N. W. 381; State v. Hevelone, 92 Neb. 748, 139 N. W. 636; Hoopes v. Creighton, 100 Neb. 517, 518, 160 N. W. 742, L. R. A. 1917C, 1146, Ann. Cas. 1917E, 847; Allan v. Kennard, 81 Neb. 289, 116 N. W. 63.

[3] By chapter 83, Laws 1917, p. 196, section 3467, R. S. Neb. 1913, was amended so that by chapter 191, supra, and chapter 83, full power and authority, in our opinion, was given to the defendant to make the contract of December 12, 1917. Chapter 82, Laws Neb. 1917, p. 194, in amending section 3465, Rev. Stat. Neb. 1913, expressly authorized control of the service by the defendant for the purpose of enforcing irrigation taxes. We are unable to find from this legislation or the contract that the sovereign powers of the state of Nebraska referred to were invaded or attempted to be granted away.

[4, 5] It is claimed, however, that as the United States is to operate the irrigation system that the amount of expenses for operation and maintenance are within its control, and therefore the right to determine the amount to be levied is taken from the defendant. We are of the opinion that this is not a reasonable construction of the language used. The defendant is only obliged to levy and collect taxes sufficient to meet the necessary expenses of operation and maintenance of the irrigation works and system, and what the necessary expenses are the defendant has a right to determine for itself, because its obligation to levy the taxes extends only to the amount necessary for the operation and maintenance of the irrigation works and system. By the contract of August 10, 1915, made between the Tri-State Land Company, the defendant, and the United States, it was agreed that the charges for operation and maintenance of the irrigation system should be estimated in advance by defendant's board of directors. So that prior to December 12, 1917, it had been settled as to where the power to determine the amount of the annual expenses for operation and maintenance should be lodged. The mere management and operation of an irrigation system for the benefit of the landowners cannot be said to be an exercise of any of the powers of state sovereignty. If the defendant had employed a manager to operate its system, the manager would not be exercising any of the powers of state sovereignty, and the fact that defendant conveyed its irrigation system to the United States, who was its creditor, in trust, for the purpose of management, does not change the situation.

[6] It had also been provided by the contract of August 10, 1915, above mentioned, which obligated the defendant and the Tri-State Land Company to pay to the United States $475,000 for water stored in the Pathfinder reservoir, and which granted to the United States a permanent carriage right of 250 second feet of water through defendant's main canal from the North Platte river to Red Willow creek for the irrigation of an additional unit to be included in the North Platte project of the United States, that the United States should pay to defendant as an operation and maintenance charge for the carriage of

water through defendant's main canal one-fifth part of such amounts as should be expended by defendant each year for the operation and management of its works used in diverting and carrying the water of the United States. The facts recited show that the United States had a direct and important interest as to how defendant's irrigation system should be managed. It was to use this system for carrying its own water, and also was a creditor of defendant in the sum of $475,000, both of which important interests the evidence shows were in danger of being lost through the inability of the defendant to longer operate its irrigation system. It is also recited in the contract of December 12, 1917, that the co-operative use of the defendant's drainage works would be for the benefit of the North Platte project of the United States.

We are of the opinion that the foregoing facts bring the situation within the provisions of section 2 of the Act of February 21, 1911, 36 Stat. 926, which authorizes the Secretary of the Interior, upon terms to be agreed upon, to co-operate with irrigation districts for the construction or use of reservoirs, canals, or ditches as might be advantageously used by the government and irrigation districts. So far as the expenditure of money by the United States in connection with the irrigation works is concerned, the contract provided that all these expenditures should finally be paid by the defendant as part of the operation and maintenance of the irrigation works. We have no doubt but that the Secretary of the Interior had full power and authority to make the contract. The fact that he did make it shows a construction by the Department of the Interior of the statutes relating to the Reclamation Service favorable to the contention of counsel for defendant.

[7] It is further claimed by counsel for the plaintiffs that the Secretary of the Interior had no authority to bind the United States to operate any irrigation project which the United States did not hold by absolute title. We are of the opinion that the laws in existence relating to the Reclamation Service gave the United States the power to take over the operation of the irrigation system for the purpose of securing the payment of a debt contracted by the system to the United States. Not much specific authority is needed for a creditor to take over the management of a debtor's property with the latter's consent, in order to protect the creditor's rights.

[8, 9] The objection that the taking over of defendant's irrigation system was not made within the time limited by the proposal, or the contract with the United States completed within such time, even if the statement upon which the objection is based is true, which we do not decide, cannot be relied on by plaintiffs to defeat their contract as the delay was caused by them. The contention that the words "take over," found in the proposal, meant that the United States should purchase the irrigation works of defendant and become the owner thereof, must fail, as being contrary to the intention of the parties making and accepting the proposal. The primary meaning of the words is "to assume control or management of," and in any event the transaction between the defendant and the United States was clearly a taking over of the irrigation system, whatever the words might mean in some other con-

nection. It will hardly be contended that the words ever are or could be used for the purpose of conveying title.

The "details, terms, and conditions for the taking over" were left to a board appointed by the plaintiffs. Their action as to the manner of taking over is very strong evidence of how the plaintiffs and defendant understood the meaning of the words. If the plaintiffs had intended that there should be a purchase by the United States of the irrigation system, it would have been very easy to have said so in the proposal. There was no consideration for a purchase mentioned, and at the time the proposal was made no one knew just what arrangement could be made with the United States. To have tied the matter up, so that there must be a purchase, would have defeated the object of the proposal in the beginning. There would be $2,000,000 in bonds left to be paid after the cancellation of the $203,000 in bonds, and nothing was said about the United States assuming the payment of the bonds. The first whereas clause of the proposal speaks of the United States taking over and operating the Farmers' Irrigation District canal. If the words "take over" meant an outright purchase of the irrigation system, plaintiffs would have had no interest in the operation of the system. We are of the opinion that, from the proposal itself, no other meaning can be given to the words "take over," except that they meant the assumption and control or management of the irrigation system.

[10] We find no violation of the express stipulations of the proposal, and if the details, terms, and conditions of the taking over are not satisfactory, they are as the board appointed by the plaintiffs themselves made them. So far as the contract being burdensome is concerned, the situation of the parties must be taken into consideration. The record fairly shows that the bonds held by plaintiffs would have been worthless if the defendant had been obliged to continue alone to manage and operate the affairs of the irrigation system. $203,000 worth of bonds surrendered, where there was a possibility of saving $2,000,000 would seem to be a small matter. It would extend this opinion beyond all reasonable limits to notice everything that has been discussed in the briefs of counsel. As to the main contentions, we are satisfied that at the time the court entered its final decree, its action was just and right between the parties.

[11] So far as the appeal of the defendant is concerned, the questions raised thereby are not entirely free from difficulty. Defendant claims that, if its acceptance and the performance of the conditions of the proposal made a valid contract between the plaintiffs and defendant, that contract ought to be enforced as of the date when defendant claims it had fully performed the conditions required of it; to be more specific, not later than January 1, 1918. The judgment for the plaintiffs is for interest coupons which became due July 1, 1918. If the contract should be enforced as of January 1, 1918, then there would be $203,000 in bonds which would have drawn no interest after that date, and the balance of the bonds would have drawn interest in accordance with the terms of the proposal or contract between the parties. The amount involved is, of course, considerable. Generally speaking,

if it could be said that the delay in the performance of the contract was wholly attributable to the plaintiffs, then the contract ought to be enforced as of the date claimed. Section 6 of the contract, however, provides that it shall not become binding and effective until there has been submitted to the Secretary of the Interior satisfactory evidence that $203,000 of the $2,203,000 bonds of the defendant outstanding had been canceled, and that there had been deposited with the Secretary certified copies of the agreement entered into between the plaintiffs and the defendant, and such agreement declared by him in writing as satisfactory.

The refusal of the plaintiffs to perform the terms of the proposal prevented a strict compliance with this section. It was, however, a matter between the defendant and the United States, and the Secretary of the Interior was satisfied with the decree of the court compelling the plaintiffs to perform the terms of the proposal. If the United States or the Secretary of the Interior was satisfied, the plaintiffs cannot be heard to complain, so far as compliance with section 6 is concerned. The objections of the plaintiffs to the performance of the proposal cannot be said to be frivolous. Some of the objections present questions concerning which lawyers might differ, and therefore the court cannot say that the plaintiffs intentionally and without cause delayed the settlement between the parties. We are inclined to the view that the trial court's action in the premises should be sustained, and we therefore affirm the decree below; plaintiffs and defendant paying all the costs of their own appeal.

Affirmed.